

**IT IS ORDERED as set forth below:**


**Date: February 19, 2019**

_Wendy L. Hagenau_
_____
**Wendy L. Hagenau**
**U.S. Bankruptcy Court Judge**

_____

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO. 16-61657-WLH |
| | ) | |
| STEVEN THOMAS CLARK, | ) | CHAPTER 7 |
| | ) | |
| Debtor, | ) | JUDGE WENDY L. HAGANAU |
| | ) | |
| | ) | |
| STEVEN THOMAS CLARK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ADV. PROC. NO. 16-5189 |
| | ) | |
| UNITED STATES INTERNAL | ) | |
| REVENUE SERVICE, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER AFTER TRIAL

This matter is before the Court, after trial, on the complaint by the Debtor against the Internal Revenue Service ("IRS") to determine the dischargeability of certain debts. The complaint sought a determination with respect to tax years 2001, 2004 and 2006 through 2011. By

the time of trial, however, the parties had stipulated to the nondischargeability of the principal of the debt for taxes for 2001, and the dischargeability of penalties assessed thereon. Additionally, the taxes for 2004 were paid. At the trial, then, the issue was the dischargeability of taxes due for tax years 2006 through 2011. The Debtor testified via video deposition which the Court reviewed in its entirety. The parties stipulated to the admissibility of Mrs. Clark's deposition, which the Court also reviewed. The IRS presented live testimony of an IRS employee.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the matter is a core matter under 28 U.S.C. § 157(b)(2)(I).

## FINDINGS OF FACT

The parties submitted a Statement of Undisputed Matters of Fact as Attachment C to their pretrial order [Docket No. 66], which is fully incorporated herein. Plaintiff Steven Thomas Clark ("Dr. Clark") filed his petition under Chapter 7 of the Bankruptcy Code on July 2, 2016. Dr. Clark is a radiologist who received his medical degree from the University of Tennessee College of Medicine. He specializes in musculoskeletal radiology and nuclear medicine. Dr. Clark incurred approximately $300,000, of student loan debt, over $290,000 of which remains owing.

At the time the petition was filed, and as of the trial, Dr. Clark was married, having been married since 1994. Beginning in 2009, however, his wife moved to Charlottesville, Virginia for schooling and did not return to live with him. After she received her graduate degree in 2012, she continued living in Charlottesville and working. She briefly moved back to Georgia but lived in a separate home and then in 2016 moved to Tennessee where she presently resides. While she lived in Virginia, both as a student and as an employee, Dr. Clark contributed toward her living expenses. In some years, he paid as much as three quarters of her rent, approximately $900 per month. In December 2017, Dr. Clark and his spouse began a divorce proceeding. Since the beginning of the

divorce proceeding, Dr. Clark has been ordered by the state court to pay $2,000 per month in spousal support and a $15,000 one-time payment to Mrs. Clark for certain issues. He has also incurred attorney's fees in connection with the divorce.

Dr. Clark has four children. In 2006, his younger children were aged approximately 7 and 8, and his two older children were in their early 20s. The two younger children initially stayed with Dr. Clark when their mother moved to Virginia, but they later moved to Virginia to join her. Dr. Clark's expenses during the time period 2006 through 2011 included expenses for the children's school, cars and extra-curricular activities. For the two younger children, Dr. Clark paid total tuition of approximately $50,000 in 2016 and 2017.

The Debtor's employment history has been irregular. In 2006, the Debtor worked as a radiologist with the Veterans Administration until March 2006. He was then unemployed from April to July 2006. Thereafter, he was employed as a radiologist, sometimes working from home and sometimes working onsite. In 2007, the Debtor was unemployed for January and February, but worked full-time March through December at an onsite radiology practice. In 2008, the Debtor was unemployed from January to July 2008, but then was fully employed for the remainder of the year. In 2009, the Debtor was employed full-time for the year. In 2010, the Debtor was employed full-time until August, but then only part time through the remainder of the year. In 2011, the Debtor was employed part-time until September and then full-time for the remainder of the year. In 2012, the Debtor was again employed only part-time until August and then full-time for the remainder of the year. In 2013, the Debtor was unemployed and received unemployment income from the State of Tennessee for the months of June through December 2013. In 2014, the Debtor was also unemployed until June of 2014; then he became fully employed through the remainder of the year. In 2015, the Debtor was fully employed from January until July of 2015 and then was

unemployed for the remainder of the year.  In 2016 through the trial date, the Debtor was fully employed.  As of the trial date, the Debtor was employed at a hospital in Illinois where he works a night shift of around nine to ten hours.

The Debtor and his wife purchased a home in Sandy Springs, Georgia in 2001 for approximately $562,000.  The home has approximately 4,000 square feet with five bedrooms and a pool.  The pool and other areas of the house need some repair and improvement.  The Debtor has been in default on his mortgage since late 2010 or early 2011.  As of the petition date, the lender alleged he was 27 months delinquent.  The Debtor obtained a loan modification in September 2011 pursuant to which $315,300 of the Debtor's mortgage would be deferred and eventually forgiven if his payments were made timely.  The payments were reduced from a principal and interest payment of $4,817 to $2,614.  Another loan modification was prepared in July 2012 reducing the deferred principal to $210,200.  The Debtor never put his house on the market or attempted to sell it, even when his wife and children moved out.  He believed the value of the house was less than the amount owed the lender.  The Debtor's house, as of the time of trial, was scheduled for foreclosure in November 2018.

In addition to the home, the Debtor scheduled two older BMWs, a 1991 and a 1999 model, with estimated values of $1,100 and $5,000 respectively.  As of the petition date, the Debtor had minimal money in checking accounts (approximately $2,000) and only about $2,400 of other personal property.  The Debtor had no retirement fund or significant savings.  A review of the Debtor's pre-petition expenses reflects that his money was used primarily for ordinary living expenses and upkeep on the house with infrequent vacations with his family to Florida or South Carolina.

Due to the Debtor's irregular employment and periods of underemployment, his financial situation was difficult. His difficulties were exacerbated when his wife ceased working and returned to school in 2009, because now a single income had to support a family in two residences. The Debtor borrowed approximately $72,000 from his parents beginning in 2011 in order to cover a variety of expenses. This loan was not repaid. Each time he wished to borrow money from his parents, he created a list of expenses that were necessary to be paid. The expenses include home related expenses and about $250.00 a month in food, gas and other expenses but no entertainment expenses. Some of these lists included the payment of income taxes, but many of them did not. During the relevant time period, the Debtor also obtained title pawns on several of his cars and used a check-cashing service. The Debtor testified that the title pawns were paid off in large part through the loans from his parents.

The Debtor attributes his irregular employment and financial mismanagement to a series of medical conditions. He was diagnosed with ADHD in 1997 after having been previously diagnosed with anxiety and depression in 1993. He believes these conditions affect his ability to work successfully because he is unable to remain focused for prolonged periods of time, he is not always timely to work, and his productivity is low. The Debtor believes his medical condition affected his marriage. He also contends that, at times when finances where tight, he did not always purchase the medication required to control his condition. He believes his condition affects his ability to keep adequate financial records. The evidence showed the Debtor and his wife had a joint account at Bank of America in 2011 from which he paid his accountant and tax lawyer. His wife testified she stopped sharing a bank account with him because he continually overdrafted the account. As a result, he often used cash for his expenses, but the Debtor had an account at Chase Bank at least in March and April 2016.

The Debtor's payment of income taxes has also been sporadic and irregular. As mentioned above, the complaint initially sought a determination as to the dischargeability of 2001 taxes. The parties have stipulated that the 2001 taxes are non-dischargeable, but the penalties assessed in connection with them are dischargeable. The initial complaint also sought a determination with respect to the 2004 taxes, but those taxes have been paid, apparently through offsets or other mechanisms. The fundamental problem the Debtor has is that, when he was not a W-2 employee, which is most often, he did not make any arrangements for setting aside money to pay his taxes or for paying estimated taxes. At the time of the trial, the Debtor had not filed his 2012 through 2017 tax returns. A summary of the status of each of the years at issue is set forth below:

> 2006 – The Debtor obtained an extension to file his tax return through October 15, 2007, but made no estimated tax payments. The return was filed late on June 23, 2008. The return reflected adjusted gross income of $226,035, tax due of $53,198, and tax withheld of $30,588.

> 2007 – The Debtor obtained an extension to file his tax return through October 15, 2008, but made no estimated tax payments. The return was timely filed and showed adjusted gross income of $287,225, tax due of $85,117, and tax withheld of $9,813. The Debtor also paid approximately $2,700 in periodic payments toward his 2007 liability in November 2010 and January 2011.

> 2008 – The Debtor obtained an extension to file his tax return through October 15, 2009, but made no estimated tax payments. The return was filed late on June 7, 2010 and showed adjusted gross income of $133,330, with tax due of $27,681, and tax withheld of $1,245.

> 2009 – The Debtor obtained an extension to file his tax return through October 15, 2010 and paid $6,200 in estimated tax. The return was filed timely and showed adjusted gross income of $222,241, tax due of $62,061, and no tax withheld.

> 2010 – The Debtor obtained an extension to file his tax return through October 15, 2011, but made no estimated tax payments. His return was filed late on February 13, 2012. It showed adjusted gross income of $149,246, tax due of $41,052, and no tax withheld.

> 2011 – The Debtor obtained an extension to file his tax return through October 15, 2012, but made no estimated tax payments. The return was filed late on

December 3, 2012.  It showed adjusted gross income of $64,485, tax due of $12,736, and no tax withheld.

The total amount claimed by the IRS to be due for the 2006 through 2011 taxes plus interest as of June 25, 2018 is $408,261.42.

Although only the taxes through 2011 are at issue in this adversary proceeding, the evidence at trial showed that, as of that date, the Debtor had not filed 2012, 2013, 2014, 2015, 2016 or 2017 returns.  He personally prepared at least the 2014, 2015 and 2016 returns, but did not file them.  Instead, he prepared the returns in order to provide them to the mortgage company to support a request for a loan modification.  The Debtor explained that because he anticipated a refund, timely filing was not a priority.  He further testified he did not have the money to pay an accountant to prepare the other returns, but the Court notes the 2012 return was already prepared by an accountant.

Sometime in 2011, the Debtor retained Lance Einstein to assist him with his tax issues. From 2011 to present, the Debtor estimated he paid Mr. Einstein approximately $10,000.  The Debtor, however, did not know or remember if Mr. Einstein had met with the IRS on his behalf or had made any offers of settlement.  The Court notes Mr. Einstein did not testify at the hearing. Due to the delinquency in taxes, the IRS sent Dr. Clark numerous notices of the delinquent payments.  Dr. Clark produced at least ten notices related to these tax years dated November 2014 through November 2015, which were not even opened.  He stated he assumed Mr. Einstein, his attorney, was receiving the communications but he had no recollection of having ever discussed those with his attorney.

## CONCLUSIONS OF LAW

A presumption exists that all debts owed by the debtor are dischargeable unless the party contending otherwise proves nondischargeability.  11 U.S.C. § 727(b).  The purpose of this "fresh

start" is to protect the "honest but unfortunate" debtors. U.S. v. Fretz (In re Fretz), 244 F.3d 1323, 1326 (11th Cir. 2001). The burden is on the creditor to prove an exception to discharge by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 287-88 (1991); St. Laurent v. Ambrose (In re St. Laurent), 991 F.2d 672, 680 (11th Cir. 1993); Griffith v. U.S. (In re Griffith) 206 F.3d 1389, 1396 (11th Cir. 2000). Courts should narrowly construe exceptions to discharge against the creditor and in favor of the debtors. Equitable Bank v. Miller (In re Miller), 39 F.3d 301, 304 (11th Cir. 1994); St. Laurent, 991 F.2d at 680.

Section 523(a)(1)(C) excepts from discharge any tax debt "with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax … ." The IRS has not alleged the Debtor made a fraudulent return, but claims the Debtor willfully attempted to evade or defeat a tax. The test for dischargeability under Section 523(a)(1)(C) is well established in the Eleventh Circuit and contains a conduct requirement and a mental requirement. The Court considers the totality of the circumstances, Peterson v. U.S. (In re Peterson), 317 B.R. 556, 562 (Bankr. N.D. Ga. 2004), in determining if the Debtor engaged in evasive conduct with a mental state consistent with willfulness. U.S. v. Mitchell (In re Mitchell), 633 F.3d 1319, 1327 (11th Cir. 2011).

Evasive conduct requires a showing that "the Debtor engaged in affirmative acts to avoid payment or collection of the taxes, either through commission or culpable omission". U.S. v. Jacobs (In re Jacobs), 490 F.3d 913, 921 (11th Cir. 2007) (cites omitted). The conduct requirement is not satisfied by mere nonpayment of taxes. Haas v. IRS (In re Haas), 48 F. 3d 1153, 1158 (1995), abrogated in part by Griffith. However, nonpayment may be relevant when considering the totality of the circumstances. Fretz, 244 F.3d at 1328 (cites omitted). The statute neither defines nor limits the conduct or methods by which a debtor can evade or defeat the payment of

taxes.  Instead, the statute provides that tax debt is nondischargeable if the debtor "willfully attempted <u>in any manner</u> to evade or defeat such tax." <u>Wilbert v. IRS (In re Wilbert)</u>, 262 B.R. 571, 577 (Bankr. N.D. Ga. 2001).  "Most Courts consider a debtor's failure to file returns and pay taxes as relevant omissions which should be considered in the totality of the debtor's conduct." <u>Id.</u>; <u>Mitchell</u>, 633 F.3d at 1327; <u>Fretz</u>, 244 F.3d at 1330.  Courts also consider whether the debtor characterized earnings so as not to be subject to withholding tax, made large discretionary expenditures, maintained a luxury lifestyle or dealt primarily in cash.  <u>See</u> <u>Jacobs</u>, 490 F.3d at 927; <u>Zimmerman v. IRS (In re Zimmerson)</u>, 262 Fed. Appx. 943, 946 (11th Cir. 2008); <u>Peterson</u>, 317 B.R. at 563-64; <u>Barkley v. U.S. (In re Barkley)</u>, 2010 WL 4642483 (Bankr. N.D. Ga. Sept. 24, 2010); <u>Hassan v. U.S. (In re Hassan)</u>, 301 B.R. 614, 623 (S.D. Fla. 2003).

The mental state requirement is satisfied when the debtor's acts are "done voluntarily, consciously or knowingly, and intentionally".  <u>Mitchell</u>, 633 F.3d at 1327 (cites omitted).  Willfulness can be established by showing the debtor (1) had a duty under the law, (2) knew he had a duty, and (3) voluntarily and intentionally violated the duty.  <u>Id.</u>  In most cases, the first two elements are satisfied and the court focuses on whether the debtor's failure to pay taxes was voluntary and intentional or knowing and deliberate.  <u>Id.</u> at 1328.

Direct evidence is rarely available to prove the intent of a debtor.  The courts, therefore, rely on certain types of conduct sometimes called "badges of fraud" that provide indicia of a "willful evasion by the debtor to defeat or evade his or her tax liability".  <u>Peterson</u>, 317 B.R. at 563.  Although consideration of the badges of fraud may be relevant and helpful, fraudulent intent need not be proved.  <u>Mitchell</u>, 633 F.3d at 1328.  The IRS must show something more than inadvertence, however.  <u>Id.</u>  This additional conduct may include:

> (i)     the understatement of income for more than one tax year;
> (ii)    implausible or inconsistent behavior;

(iii)    the Debtor's failure to cooperate with the IRS;
(iv)    inadequate record keeping;
(v)    transfers of assets for inadequate consideration;
(vi)    transfers that greatly reduce assets subject to IRS execution; and
(vii)    any other conduct that is likely to mislead or conceal.

None of these factors is determinative since the court considers the totality of the circumstances in each individual case.  However, the presence of multiple factors gives rise to a rebuttable presumption of willful evasion.  Peterson, 317 B.R. at 564.

The question for the Court, then, is whether the IRS has shown by a preponderance of the evidence that the totality of the circumstances demonstrates the Debtor engaged in evasive conduct with a mental state consistent with willfulness.  Because the cases are fact specific, the best way to understand the conduct and state of mind necessary to make taxes nondischargeable, is to review the cases.

In Mitchell, the Court of Appeals reversed a decision of the District Court and concluded the Debtor's taxes were nondischargeable.  The Debtor was a 1099 employee who did not file his returns for the period 1998 through 2001 until 2003.  No funds were paid when the tax returns were filed.  In 2006, the Debtor paid two installments on an agreement with the IRS.  The Debtor was divorced and then remarried.  He bought a new house and put the house solely in his wife's name.  He formed a new company and made only his wife the owner.  Later, the Debtor sold the first house and built an even more expensive house, which was again only in his wife's name. Finally, when the IRS instituted garnishment proceedings, he closed his bank account and put his money in his wife's bank account.  The Debtor testified at trial that he put the houses in his wife's name and his company in his wife's name and moved his money from his account because he knew the IRS would be pursuing him for the taxes owed.

In <u>Fretz,</u> by contrast, the Debtor did not take any affirmative action to avoid the payment of the IRS, such as moving his assets around, but the Debtor did not file tax returns for 10 years and did not make payments toward his taxes.  In fact, he never filed his tax returns, but instead relied on the returns prepared by the IRS.  The Court held for the first time that culpable acts of omission, here the failure to file tax returns for 10 years, can be sufficient to meet the conduct requirement.  The Court stated that the Debtor simply chose to ignore the IRS.

Delayed tax return filings were also a factor in finding taxes nondischargeable in <u>Hassan</u>.  The Debtor was an emergency room doctor who was a 1099 employee. Over the three years in issue, he earned over $1.3 million, but did not file tax returns until he was contacted by the IRS.  He then began a payment plan with the IRS and made a number of payments to the service, although not all that were required.  The Debtor made annual trips to India and began transacting business only in cash.  The Debtor also repaid a loan from his daughter and bought land with his funds which he titled in the daughter's name.  The Court noted the Debtor did not accumulate any assets during this time, even though his earnings were great.  The Court observed that the Debtor had a prior bankruptcy case where tax debts had been discharged, thereby evidencing a pattern of ignoring and failing to pay the IRS.  The Court concluded in part that this failure to cooperate with the IRS was a badge of fraud.

In the <u>Peterson</u> case, the Court also relied on the Debtor's failure to accumulate assets as evidence of evasive conduct and a willful mental state.  The Debtor filed returns late and failed to pay the taxes in full although the Debtor did make some payments on an agreed upon schedule.  In particular, the Court noted that the Debtor was perpetually shopping, dining, and participating in expensive entertainment and travel.  The Debtor spent tens of thousands of

dollars on credit cards, but no assets were accumulated.  The Court therefore held the taxes were nondischargeable.

In another case in the Northern District of Georgia, <u>Barkley</u>, the Debtor's tax debts arose from her withdrawal of funds from an IRA.  She initially withheld 10% for taxes but increased it to 20% on later withdrawals.  After a while, she decreased the withholding to 10% even though she knew that 10% would be insufficient.  She then entered into a repayment plan with the IRS.  During the term of the plan, though, she bought and furnished a nice home.  The Debtor also testified that she was not lavish in her spending because she believed Bloomingdale's was a middle-end store rather than a high-end store.  The Debtor was dealing in cash and changed her bank account when the IRS attempted to collect.  In finding her conduct evasive and willful, the Court focused particularly on the reduction of her tax withholding once she knew the appropriate amount, the dealings in cash, the cessation of her direct deposit into her bank account, and the opening of a new account.

The outcome was similar in <u>Carson v. United States (In re Carson)</u>, 2011 WL 3857154 (Bankr. N.D. Ga. May 17, 2011).  The Debtor was a 1099 employee who filed all of his tax returns, although some were filed late.  He made no estimated payments; although he did make payments with most of his tax returns.  After the tax years in question, the Debtor lost his job.  He then tried to obtain a home equity loan to pay the IRS but was unsuccessful.  The Court found that during the three years in issue, the Debtor spent lavishly on clothes, jewelry, electronics, and mail order deliveries.  The Debtor took a vacation to Florida.  Most importantly to the Court, was that the Debtor invested the bulk of his income in securities on margin.  The Court found that at various times during the operative period, the value of the securities being held exceeded $1 million, and that the Debtor received a lump sum commission of approximately $500,000.  The

Debtor also withdrew large amounts of cash from his bank accounts ($60,000 in one year) for which the Debtor did not account.  The Debtor paid for private school tuition, bought a car for his in-law, and continued to make charitable contributions.  The Court found the Debtor could have paid the amount due the IRS by liquidating a portion of his securities or by using his $500,000 commission.  He did neither.  The Court found the taxes nondischargeable with the exception of taxes which accrued after he lost his job.  The Court found that after the Debtor lost his job he was unable to make payments, so his failure to pay was not a result of evasive conduct or a willful intent.

Recently, in the case of Feschbach v. IRS, 2018 WL 5971650 (M.D. Fla. Nov. 14, 2018), the District Court affirmed the decision of the Bankruptcy Court that the Debtor's taxes were nondischargeable.  The Court held that excessive discretionary spending alone could be sufficient to show evasive conduct and a willful state of mind in some cases.  The Court stated it did not matter that the Debtor could not have paid the entire debt, nor did it matter that funds were paid on the debt to reduce it.  In the case, the Debtor made over $13 million in the nine years prior to the bankruptcy filing and spent more than $8.5 million on personal and household expenses and charitable contributions.  Considering the totality of the circumstances, the Court found the taxes to be nondischargeable.

On the other hand, in the case of Looft v. United States (In re Looft), 533 B.R. 910 (Bankr. N.D. Ga. 2015), the Court held the Debtor's tax debt to be dischargeable, even though his spending was arguably lavish.  In this case, the Debtor had timely filed all his tax returns and paid the taxes due pursuant to the returns.  The Debtor, however, had taken a deduction which was subsequently disallowed.  The Debtor appealed the disallowance of the deduction but was ultimately unsuccessful.  The Debtor withdrew money from his 401(k) to make a payment to the

IRS.  He did not change the amount of his tax withholding to reduce refunds (which the IRS was applying to his liabilities), nor change his bank account to avoid an IRS levy.  At the same time, he made no changes to his lifestyle.  He continued to enjoy golf at a country club and he bought a new home.  The Court held, "Although lavish spending is relevant to the conduct analysis, it is generally accompanied by additional culpable behavior intended to prevent the IRS from reaching the Debtor's assets". Id at 919.  Although the Debtor did not moderate his lifestyle after learning of his tax liabilities, his conduct taken as a whole was not evasive and his taxes were found to be dischargeable.

Taxes were also held to be dischargeable in Pisko v. IRS (In re Pisko), 364 B.R. 107 (Bankr. M.D. Fla. 2007).  Like many of the debtors in these cases, the Debtor filed his tax returns late, but he voluntarily filed the returns.  He made payments on his taxes with some of the returns and he made additional periodic payments.  The Debtor attempted to hire professionals to assist him.  The Court found no evidence of an opulent lifestyle.  For example, the Debtor and his wife owned a home, but the Court concluded it was not luxurious.  Importantly to the Court, the IRS did not establish that the Debtor could pay a meaningful amount of the tax liability.  His business suffered unmanageable losses depleting his personal assets and causing him to incur numerous debts.  Under the facts of this case, the Court determined the Debtor's conduct was not evasive or willful.

It is clear from a review of the decisions on this topic that simply failing to pay taxes is not enough to make the taxes nondischargeable.  Similarly, the cases make clear that a debtor agreeing to an installment plan with the IRS or making payments on his taxes is not enough, alone, to find the taxes dischargeable.  Rather, the Court is to consider the totality of the circumstances and not any one factor.

As to conduct considered evasive, there are several common threads.  First, most debtors filed returns late and of course all owed taxes.  Second, most of the debtors were found to have a lavish lifestyle, and making large discretionary expenditures instead of paying taxes is viewed as evasive conduct.  This lifestyle included buying new assets at a time when the taxes were owed, commonly a new and bigger house, or buying stock for investment purposes.  See Barkley, Feshbach, Peterson, Hassan, and Carson.  Property transfers from the debtor to family members is another demonstration of evasive conduct.  For example, debtors have transferred ownership in a house to a spouse, see Mitchell, or purchased real property in the name of a daughter, see Hassan, or purchased a new car for an in-law, see Carson.  Transferring assets that would otherwise be available to the IRS is evasive conduct.  Most of the cases involve some level of affirmative avoidance of the payment of taxes or the IRS's attempts to collect taxes.  In many cases, the debtors have closed existing bank accounts and either opened new ones that have not yet been garnished or begun depositing checks in an account in a family member's name.  See Barkley and Hassan.  Many of the debtors began to operate almost exclusively on a cash basis, thereby not having a bank account for the IRS to garnish.  A final common thread in finding taxes nondischargeable is the debtor making "loans" to family members.  See Peterson and Hassan.  These "loans" removed assets from potential garnishment or liens.

This case is different though because it does not present the Court with any of these common threads of evasive conduct, other than some late filed returns and a failure to pay taxes. The IRS contends that Dr. Clark's lifestyle was lavish, and his discretionary spending is evidence of evasion of paying his taxes.  The Debtor was and is a doctor and certainly had a sizable income.  It is important in this case, however, to note that the Debtor was unemployed or underemployed in every year taxes were due and thereafter to the petition date except 2009 and

2016.  The evidence showed that during the period of 2006 through 2016, the Debtor was completely unemployed for approximately 26 months.  Much of the remaining time he worked part-time.  No evidence was presented that this unemployment or underemployment was intentional, voluntary or part of any scheme to evade the payment of taxes.  In fact, the only evidence presented was that the Debtor lost his jobs due to poor performance.  The Debtor's financial condition was exacerbated by the fact his wife decided to quit her job with the State of Georgia in 2009 and move to Virginia.  Clearly the timing of this decision was not helpful from the Debtor's perspective.   Mrs. Clark's decision reduced income to the family, increased the family's expenses and modified the Debtor's health insurance.  No evidence was presented that Mrs. Clark's decision was motivated in any way by the Debtor's tax situation.  The IRS suggests Dr. Clark should not have paid for any of his wife's living expenses in Virginia.  Nevertheless, Mrs. Clark was still his wife.  She lived in an apartment, which is not lavish living, and sometimes their minor children were with her.  Dr. Clark remained obligated to help support his wife and children during this time.  The Court cannot conclude that his decision to contribute to her living expenses in Virginia qualifies as a lavish expense.

The IRS emphasized that the Debtor negotiated a mortgage loan modification and a hardship student loan deferral but did not resolve his tax debt.  The Court does not question the Debtor's priorities in that regard.  The Debtor negotiated reductions or forbearances in expenses with his home and student loan lender, while the IRS resolution required an increase in expenditures.  Moreover, the Debtor testified he could not maintain his medical license if he was in default on his student loans.  It benefits no one to have the Debtor unemployed.

The IRS points out that during the relevant pre-petition time, the Debtor bought two used cars for his children and took at least two vacations with his family, one to Florida and one to

South Carolina.  The IRS contends this is evidence of a lavish lifestyle.  The Court agrees that buying cars for children and taking vacations, even modest ones are not necessary to living and that the Debtor could have saved money by not incurring these expenses.  But the cars were used, and the vacations were modest.  The Debtor's expenses were otherwise modest with no evidence of sums spent on clothes or entertainment.  The IRS also points out that in 2016 and 2017, the Debtor paid approximately $50,000 in college tuition for two of his children.  Paying college tuition, particularly out-of-state tuition is not necessary.  The Court notes, though, that a substantial portion of this was paid post-petition.  The Court acknowledges that it can "consider a debtor's conduct after the return and payment were due" in determining if he willfully attempted to evade taxes.  United States v. Weiss, 2000 WL 1708802, *3 (E.D. Pa. Nov. 15, 2000).  The Court has taken the Debtor's conduct throughout the pre-petition period into account, but views post-petition activities differently in this case.  Debtor contended he was entitled to a discharge of these taxes and was entitled to refunds in certain years for which tax returns had not been filed.  On the facts of this case, the Court does not view the post-petition payment of college tuition as lavish.

Furthermore, the arguably unnecessary or lavish expenses were not incurred in lieu of payment to the IRS.  The Debtor borrowed $72,000 from his parents which was never repaid.  The $72,000 he borrowed is more than the discretionary college tuition expense and other expenses he incurred.  The Court concludes that while some of the Debtor's expenses could be considered lavish under certain circumstances, considering the facts as a whole and that these expenses were less than the money he borrowed from his parents, they are not evidence of using income to support a lavish lifestyle instead of paying taxes.

The IRS makes much of the fact that the Debtor had a large house in Sandy Springs Georgia which he did not sell.  It is undisputed that the Debtor bought the house in 2001, prior to the tax years in question.  The house is large and no doubt larger than what was needed, particularly as his children grew up and moved either to Virginia with their mother or went to college.  Maintaining a house of that size forced the Debtor to incur some maintenance costs that he might not have incurred had he decided to live in an apartment.  The IRS points out the Debtor never attempted to sell his house.  The Court is aware, however, of the recession to hit Atlanta and the rest of the country beginning in 2008 and lasting until at least 2011 in the Atlanta area. The undisputed evidence was that the Debtor could not sell his home during this time period and that the debt on the home exceeded (and still exceeds) the value of the home.  The Debtor defaulted on his mortgage in 2010 or early 2011.  He was successful in negotiating a loan modification in 2011 resulting in a reduction of over $2000 a month in principal payments.  Although the Debtor did not sell his large house, he did cut the expense of owning the house almost in half which shows the Court that he was not attempting to maintain a lavish lifestyle, but rather to address the financial situation in which he found himself.

Contrary to the IRS's position, the Debtor was in great financial difficulty due to his irregular employment, his wife quitting her job and the family incurring additional expenses when she moved to Virginia.  The Debtor pawned his cars and then borrowed $72,000 from his parents in order to release the cars from the pawn and otherwise pay the expenses, about many of which the IRS complains.  The cases are clear that an ability to pay the tax debt is a factor in determining whether the actions of the Debtor constitute evasive conduct.  See, Lacheen v. IRS, (In re Lacheen), 365 B.R. 475, 483, 486 (Bankr. E.D. Pa. 2007); Pisko, 364 B.R. 107, 114.  In Carson, Judge Drake decided that after the Debtor became unemployed, he could not have paid

subsequent taxes, and they were therefore dischargeable.  In contrast to the case of <u>Carson</u> and

others, this Debtor never had a lump sum of cash or stock in an investment account which could

have been liquidated to pay his debts in full.  Given the irregularity of his employment and his

income, he never had the ability to make a substantial payment on the tax debt.

   The other common threads of evasive conduct discussed above are not present here.  No

evidence was presented that the Debtor transferred any property to any family member or other

person.  No evidence was presented of the Debtor taking any affirmative avoidance actions.  The

Debtor made no loans to anyone; in fact, he received loans from his family.  The Debtor was a

1099 employee, but no evidence was presented that this was by choice.  The Debtor testified that

any time he could be a W-2 employee with his employer, he made that choice.

   Here, the only conduct of the Debtor that is potentially evasive is that he did not pay his

taxes when they were due, four returns were filed late, and the Debtor made minimal efforts to

make payments on his taxes.  Of the six tax returns at issue, four of them were filed late, but all

were filed voluntarily within a year of their due date as outlined above.  None of the returns were

prepared by the IRS or in response to IRS demands.  There is no dispute the Debtor did not pay

his taxes when due.  The Debtor obtained extensions to file his return in each year, but only

made one payment in connection with the requested extension.  In three of the six years, no taxes

were withheld.  No taxes were paid when any of the returns were filed.  The Debtor made a

minimal effort to work out a payment arrangement with the IRS.  He hired a lawyer to assist him

and some efforts were made to reach agreement on a payment plan, but only $2,700 was paid

under the plan and the Debtor was unaware of what efforts his lawyer made on his behalf.

(Interestingly, neither the IRS nor the Debtor called the attorney as a witness).  It is worth noting,

however, that making a payment arrangement with the IRS and making payment pursuant to it

would not have dictated that the taxes be dischargeable.  While it is a close call, the Court

concludes based on the totality of the circumstances that the IRS has not satisfied its burden of

showing the Debtor's conduct of failing to pay taxes, filing returns slightly late and failing to be

proactive in resolving his tax issue is evasive conduct.

      Even if the Court were to conclude that the Debtor's acts constituted evasive conduct, the

Court must find the acts willful.  There is no doubt the Debtor had a duty to pay taxes and knew

he had that duty.  The Debtor failed to open notices from the IRS about his delinquency, and

being willfully ignorant or blindly relying on professionals without knowing what they are doing,

does not excuse one's obligation to pay taxes.  The Debtor argued that his failure to pay taxes

should be excused by his medical condition.  The Court disagrees.  Although the Debtor has

ADHD and other impairments, he remained able to work as a radiologist.  He also actively

pursued a mortgage loan modification and a hardship deferral of student loans.  Dr. Clark's

wherewithal in these scenarios confirms that his medical condition did not impair his ability to

pay his taxes.

      A review of cases demonstrates that willfulness is most often shown through affirmative

conduct to avoid collection.  In these cases, the debtor has transferred property such as in

Barkley and Mitchell or had significant discretionary spending such as in Mitchell and Carson or

made loans to his family as in Peterson or reduced his withholding or otherwise intentionally

avoided the efforts of the IRS to collect the taxes due.  These affirmative acts are made willfully

and intentionally so they may evidence the mental state required.  None of that affirmative

conduct exists in this case.

      As set out above, many Courts review the badges of fraud as some evidence of a debtor's

willfulness.  Among that list, the only possible badge of fraud that could apply to this Debtor is

to construe the Debtor's lack of proactive efforts with the IRS to constitute a failure to cooperate with the IRS.  The Debtor did hire an attorney and an accountant to address his tax issues, but he really was not aware of what efforts had been made with the IRS.  The evidence shows that the Debtor and the IRS entered into one or more payment plans, but they were not successful.  The most obvious evidence of the Debtor's ignoring his tax issue was his failure to open a number of notices from the IRS regarding the delinquent taxes due for this period.  Certainly, ignoring the IRS and sticking your head in the sand is a factor to take into account under the totality of circumstances.  But other circumstances show the Debtor's failure to pay was not willful.  In particular, the Debtor's irregular employment and his wife's decision to reduce the family's income while increasing its expenses, are factors the Court must consider since a debtor cannot willfully evade taxes if he does not have an ability to pay.  Considering all the circumstances including the Debtor's demeanor in his video deposition and absence of affirmative conduct coupled with the Debtor's financial condition, the Court concludes that the IRS has not carried its burden to show any evasive conduct was willful.

CONCLUSION

Based on the foregoing, judgment is entered for the Debtor. Taxes owed by the Debtor to the IRS for the periods 2006-2011 are dischargeable under 11 U.S.C. § 523(a)(1)(C).

### END OF ORDER ###

**DISTRIBUTION LIST**

William A. Rountree
Rountree & Leitman, LLC
Building B, Suite 100
2800 North Druid Hills Road
Atlanta, GA 30329

David S. Klein
Rountree & Leitman, LLC
Building B, Suite 100
2800 North Druid Hills Road
Atlanta, GA 30329

Archana Ravindranath
Department of Justice, Tax Division
555 4th Street NW, Suite 6209
Washington, DC 20001